# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Carla Denise Garrison and Clint Garrison,
Appellants/Respondents,

v.

Target Corporation, Respondent/Appellant.

Appellate Case No. 2017-000267

———————————

Appeal From Anderson County
R. Keith Kelly, Circuit Court Judge

———————————

Opinion No. 5711
Heard May 15, 2019 – Filed January 15, 2020

———————————

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

———————————

Joshua Thomas Hawkins and Helena LeeAnn Jedziniak, both of Hawkins & Jedziniak, LLC, of Greenville; and G. Todd Butler, of Phelps Dunbar LLP, of Jackson, Mississippi, all for Appellants/Respondents.

Lewis F. Powell, III and George P. Sibley, III, both of Hunton & Williams LLP, of Richmond, Virginia; and Knox L. Haynsworth, III, of Brown, Massey, Evans, McLeod & Haynsworth, LLC, of Greenville, all for Respondent/Appellant.

———————————

**GEATHERS, J.:**  In this negligence action, Appellants/Respondents, Carla Denise Garrison and Clint Garrison (the Garrisons), challenge the circuit court's order setting aside the jury's $4.5 million punitive damages award, arguing (1) there was sufficient evidence to support the jury's finding that the conduct of Respondent/Appellant Target Corporation (Target) was reckless, willful, or wanton; (2) the verdict was not excessive; and (3) Target waived the application of the punitive damages caps set forth in section 15-32-530(A) of the South Carolina Code (Supp. 2019).  The Garrisons also challenge the circuit court's pre-judgment interest award, arguing the circuit court erred by calculating the interest on compensatory damages only.  Target appeals the circuit court's denial of its motion for a judgment notwithstanding the verdict (JNOV) as to liability, arguing there was insufficient evidence of Target's constructive knowledge of a dangerous condition on its premises.  Target also appeals the denial of its motion for a new trial absolute, arguing the punitive damages award reflected the jury's passion, caprice, and prejudice.  We affirm in part, reverse in part, and remand for a remittitur of the jury's punitive damages award.

## FACTS/PROCEDURAL HISTORY

On May 21, 2014, Appellant/Respondent Carla Denise Garrison (Denise) and her eight-year-old daughter (Daughter) visited the Target store in Anderson.  After parking her car, Denise retrieved her coupon book and placed it on the hood of the car to examine it.  As she was examining the coupon book, Denise heard Daughter ask, "Mommy, what is this?"  Denise turned her attention to Daughter and saw her holding a syringe with a needle in it.  Denise "immediately reacted" by swatting the syringe out of Daughter's hand, exclaiming, "Don't ever pick anything like that up, that's dirty, that's nasty."  When Denise swatted the syringe, the needle punctured her right palm, and she noticed a bead of blood emerge from the puncture site.

Denise went inside the store to wash her hands several times and called her husband, Appellant/Respondent Clint Garrison (Clint).  Clint advised Denise to report the incident, so Denise spoke to the store manager, Shelby Brintnall, and they both took photographs of the syringe lying in the parking lot.  Brintnall took possession of the syringe and completed a "Guest Incident Report" form, recounting the incident as Denise had relayed it to her.[1]  In response to the form's question, "Was the floor/ground clean and dry," Brintnall checked the "No" box.  Brintnall also advised Denise to get medical treatment and give the bill to her.  After Denise

---

[1] Brintnall testified she placed the syringe in a bag and placed a label on the bag stating "Do Not Touch" and the syringe later "end[ed] up" in a "hazard box."

left the store, Brintnall completed a second report that was entitled "LOD Investigation Report."[2]  In this report, Brintnall indicated that she did not see a needle in the syringe.

The next day, Denise visited the local hospital emergency room, where a nurse referred Denise to an infectious disease specialist, Dr. Potts,[3] at AnMed Health Specialty Clinic.  The clinic collected a blood sample to have it tested for HIV and hepatitis, and Dr. Potts prescribed several medications targeted at preventing HIV and hepatitis.  The medications caused Denise to feel dizzy and lose her balance.  They also upset her stomach, put her into a "zombie-like state," and caused her to have night terrors.  Clint testified that Denise was bedridden during this time.  Clint had to take unpaid leave from work to care for Denise, and Clint's mother had to help care for the Garrisons' four children.  Further, Denise had to have her blood tested every three months for approximately one year.

Soon after Denise started taking the medications, an investigator for Target telephoned Denise and asked her if she thought Target was responsible for her injury.  She told the investigator that Target was "supposed to take care of the parking lot" but she was asking only that Target pay her medical bills.  Denise eventually filed an action against Target seeking damages for negligence and violation of the South Carolina Unfair Trade Practices Act.  Subsequently, Denise submitted to Target a $12,000 offer of judgment, but Target did not accept the offer.  Denise and Clint later filed a second action against Target, asserting causes of action for negligence and loss of consortium.  The circuit court consolidated the two actions and conducted a trial on September 5 through 8, 2016.

At trial, Brintnall testified that Target's Anderson store did not have a formal policy for regular "safety sweeps" of the parking lot but there were measures in place to keep the parking lot in order.  She stated that the store had cart attendants who retrieved carts from the parking lot and simultaneously checked for debris and picked it up.  The attendants also advised the team lead-on-duty of anything they saw that "need[ed] to be noted."  However, Brintnall admitted that management did not "have a set time" for the cart attendants to perform these tasks; rather, they did them "every so often."  Brintnall added that the store's Property Maintenance Technician, Jonathan Jackson, "walk[ed] the building" in the mornings.

---

[2] "LOD" is an acronym for the store's team "lead-on-duty."

[3] The record does not indicate a first name for Dr. Potts.

The parties also introduced testimony regarding Target's loss of the syringe and the Garrisons' loss of photographs of the syringe. Brintnall explained that after she took possession of the syringe, she thought that a co-worker disposed of it but later learned that it was still at the store. Subsequently, an employee of the Garrisons' counsel took photographs of the syringe with her cell phone, but those photographs could not be produced for trial. Brintnall then lost track of the syringe once again, and its location at the time of trial was a "great mystery." Moreover, Clint was unable to retrieve from his own cell phone photographs purportedly showing the needle in the syringe. In light of all of this testimony, the circuit court gave a jury instruction on the doctrine of spoliation.[4]

At the conclusion of the trial, the jury returned a verdict for Denise that included $100,000 in compensatory damages and $4.5 million in punitive damages. The jury also awarded Clint $3,500 for lost wages and $5,000 for loss of consortium. The circuit court granted Target's motion for a JNOV as to punitive damages but denied Target's remaining post-trial motions. The circuit court granted the Garrisons' motion for costs, pre-judgment interest, and post-judgment interest but calculated pre-judgment interest on compensatory damages only. These cross-appeals followed.

## ISSUES ON APPEAL

1.  Was there sufficient evidence of Target's constructive knowledge of a dangerous condition on its premises to allow the issue of Target's liability to go to the jury?

2.  Was there sufficient evidence of Target's recklessness, willfulness, or wantonness to support the jury's punitive damages award?

3.  Did the amount of the punitive damages award violate due process?

---

[4] The doctrine of spoliation allows the jury to draw an adverse inference against a party who "fails to preserve material evidence for trial." *Stokes v. Spartanburg Reg'l Med. Ctr.*, 368 S.C. 515, 522, 629 S.E.2d 675, 679 (Ct. App. 2006). It is for the jury "to determine whether the party has offered a satisfactory explanation for that failure," and if the jury "find[s] the explanation unsatisfactory, [it is] permitted—but not required—to draw the inference that the evidence would have been unfavorable to the party's claim." *Id.*

4. Did Target waive the application of the punitive damages caps in section 15-32-530?[5]

5. Did the punitive damages award reflect the jury's passion, caprice, and prejudice such that a new trial absolute was required?

6. Did the circuit court err by calculating pre-judgment interest on compensatory damages only?

## STANDARD OF REVIEW

### JNOV

"When ruling on a JNOV motion, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party." *Williams Carpet Contractors, Inc. v. Skelly*, 400 S.C. 320, 325, 734 S.E.2d 177, 180 (Ct. App. 2012). "This court must follow the same standard." *Id.* "If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt, the case should be submitted to the jury." *Id.* (quoting *Chaney v. Burgess*, 246 S.C. 261, 266, 143 S.E.2d 521, 523 (1965)).

"In considering a JNOV, the trial judge is concerned with the existence of evidence, not its weight." *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003). "When considering a JNOV, 'neither [an appellate] court, nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence.'" *Id.* (alteration in original) (quoting *Reiland v. Southland Equip. Serv., Inc.*, 330 S.C. 617, 634, 500 S.E.2d 145, 154 (Ct. App. 1998)). "The jury's verdict must be upheld unless no evidence reasonably supports the jury's findings." *Id.*

### Punitive Damages

---

[5] Because we conclude that Target waived the application of section 15-32-530, we need not address whether the statute is constitutional or whether the cap in subsection (A) applies to the Garrisons. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

An appellate court must review de novo a circuit court's post-trial "due process review" of a punitive damages award. *Mitchell, Jr. v. Fortis Ins. Co.*, 385 S.C. 570, 583, 686 S.E.2d 176, 183 (2009).

**New Trial Absolute**

"[I]f a verdict is so grossly excessive and shockingly disproportionate that it indicates the jury was motivated by passion, caprice, prejudice, or other consideration not founded on the evidence[,] then it is the duty of the trial court and the appellate court to set aside the verdict absolutely." *Caldwell v. K-Mart Corp.*, 306 S.C. 27, 33, 410 S.E.2d 21, 25 (Ct. App. 1991). Nonetheless, "the jury's determination of damages is entitled to substantial deference[,]" and the circuit court's decision on whether to grant a new trial based on the amount of the verdict "will not be disturbed on appeal unless it clearly appears the exercise of discretion was controlled by a manifest error of law." *Welch v. Epstein*, 342 S.C. 279, 303, 536 S.E.2d 408, 420 (Ct. App. 2000). An exception to this rule is that an appellate court must review de novo a circuit court's post-trial "due process review" of a punitive damages award. *Mitchell*, 385 S.C. at 583, 686 S.E.2d at 183.

**LAW/ANALYSIS**

**I.      Constructive Notice**

Target maintains the circuit court erred by denying its JNOV motion as to liability because there was insufficient evidence of its constructive knowledge of a dangerous condition on its premises.

> To recover damages for injuries caused by a dangerous or defective condition on a storekeeper's premises, the plaintiff must show either (1) that the injury was caused by a specific act of the defendant [that] created the dangerous condition; or (2) that the defendant had actual or constructive knowledge of the dangerous condition and failed to remedy it.

*Wintersteen v. Food Lion, Inc. (Wintersteen II)*, 344 S.C. 32, 35, 542 S.E.2d 728, 729 (2001). "Constructive notice is a legal inference, which substitutes for actual notice." *Major v. City of Hartsville*, 410 S.C. 1, 3, 763 S.E.2d 348, 350 (2014). "The defendant will be charged with constructive notice whenever it appears that the condition has existed for such length of time prior to the injury that, under existing

circumstances, he should have discovered and remedied it in the exercise of due care . . . ." *Anderson v. Winn-Dixie Greenville, Inc.*, 257 S.C. 75, 77, 184 S.E.2d 77 (1971). Target admits that this "temporal element does not require the plaintiff to precisely measure the lifespan of the hazard."

In denying Target's motion, the circuit court stated

> [A]lthough there was no direct evidence as to the exact length of time the syringe had been in the parking lot, witnesses testified the syringe was "dingy, dirty and gross," and *bore a "weathered" look* similar to other items of trash in the parking lot. That testimony, when viewed in the light most favorable to Plaintiffs, leads to the reasonable inference that the syringe was in Target's parking lot long enough to impute constructive knowledge. Thus, judgment as a matter of law is not appropriate on the constructive knowledge issue.

(emphasis added).

When viewed in the light most favorable to the Garrisons, there was sufficient evidence to support the circuit court's ruling. *See Curcio*, 355 S.C. at 320, 585 S.E.2d at 274 ("In considering a JNOV, the trial judge is concerned with the existence of evidence, not its weight."); *Williams Carpet*, 400 S.C. at 325, 734 S.E.2d at 180 ("When ruling on a JNOV motion, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party."); *id.* ("This court must follow the same standard.").

Denise testified that the syringe was old, dirty, and nasty and that she "could tell [that], obviously[,] it had been there a long time." Further, Shelby Brintnall, the manager on duty at the time Denise was injured, testified that she saw the syringe and admitted that it "look[ed] like it[ had] some wear on it." Brintnall stated that the syringe was "dirty and dingy" and one end of it had been broken off. She also affirmed that the photograph taken of the syringe showed "dings" on it as well as grime. Clint testified that from viewing the photograph of the syringe on the ground near the site of the injury, he could tell that the syringe had "been there a[]while" because it, along with surrounding debris, was "weathered." Clint also testified that some discarded twine lying near the syringe was discolored and looked like it had been run over. Admittedly, the photographs depict the location where the syringe

landed after Denise had swatted it away from her daughter's hands. Nonetheless, it is unlikely that the location where the syringe landed was any significant distance from its original location in the parking lot.

Target argues this court should not consider the Garrisons' testimony concerning how long the syringe had been in the parking lot because it was speculative. However, it is reasonable to infer from witness descriptions of the syringe's weathered appearance that it had been lying in the parking lot long enough for Target's employees to have discovered it. *See Williams Carpet*, 400 S.C. at 325, 734 S.E.2d at 180 ("If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt, the case should be submitted to the jury." (quoting *Chaney*, 246 S.C. at 266, 143 S.E.2d at 523)); *cf. H. L. Green Co. v. Bowen*, 223 F.2d 523, 525 (4th Cir. 1955) (reversing a judgment for the plaintiff and stating that the only evidence as to the defendant's constructive notice of popcorn on which the plaintiff slipped and fell was the testimony of the plaintiff's witness that she "saw the popcorn on the floor only a few minutes before [the plaintiff] entered the store and fell; that the popcorn *looked fresh, crisp and white; that the popcorn appeared not to have been walked on,* seemed to have been just dropped on the floor and *that the floor around the popcorn was clean and had the semblance of having been very recently swept*" (emphases added)); *id.* ("We cannot attribute constructive notice of the presence of this popcorn to [the defendant] on evidence proving merely that the popcorn had been there a very few minutes.").

Target also argues that the syringe could have already been in its weathered condition when it was first abandoned in the parking lot. While this is possible, there is no evidence indicating this is likely. In contrast, the weathered condition of the debris surrounding the syringe indicates it is likely that the syringe became weathered after it was abandoned in the lot. Therefore, this case is distinguishable from *Wintersteen v. Food Lion, Inc.* (*Wintersteen I*), in which two equal possibilities made the determination of how long water had been on a grocery store's floor nothing more than "pure speculation." 336 S.C. 132, 136, 518 S.E.2d 828, 830 (Ct. App. 1999), *aff'd*, 344 S.C. 32, 542 S.E.2d 728 (2001).[6] Further, while Target

---

[6] In *Wintersteen*, the plaintiff slipped on a puddle of clear liquid in a grocery store and fell, injuring her back. 336 S.C. at 134, 518 S.E.2d at 829. Because the plaintiff's own expert testified that ice falling from a drink machine could melt in as fast as one minute, this court concluded, "[W]hile the liquid could have been on the floor for an extended period of time, *it is just as possible* that it had been on the floor for only moments before [the plaintiff] fell" and "[A]ny determination of how long

compares the weathered condition of the syringe to the description of a banana peel as "withered up" and "mushed up" in *Anderson*,[7] the nature of a banana peel inside a grocery store does not lend itself to a valid comparison with a syringe in an outdoor parking lot.

In light of the foregoing, we conclude there was sufficient evidence of constructive notice to allow the jury to resolve the question of Target's liability.

## II.    Punitive Damages Award

The Garrisons argue the circuit court erred by setting aside the jury's punitive damages award because (1) there was sufficient evidence of Target's recklessness, willfulness, or wantonness to support the award; (2) the amount of the award was not excessive; and (3) Target waived the application of the punitive damages caps in section 15-32-530.  We will address these grounds in turn.  But first, we will explain how the circuit court structured its rulings on these questions, given the Garrisons' assertions that (1) the circuit court conflated evidentiary sufficiency with constitutional excessiveness and (2) the circuit court's judgment concerning the sufficiency of the evidence to support the award was clouded by the amount of the award.

In its order addressing the parties' post-trial motions, the circuit court stated, "[F]inding punitive damages unconstitutional in this case, the [c]ourt finds judgment as a matter of law is appropriate as to that aspect of the award alone."  The order then discussed the reasons for denying a JNOV as to liability and for granting a JNOV as to the punitive damages award.  This discussion included a post-trial review of the constitutionality of the punitive damages award.  *See Austin v. Stokes-Craven Holding Corp.*, 387 S.C. 22, 52, 691 S.E.2d 135, 150 (2010) ("Because punitive damages are quasi-criminal in nature, the process of assessing punitive damages is subject to the protections of the Due Process Clause of the Fourteenth Amendment of the United States Constitution." (quoting *James v. Horace Mann Ins. Co.*, 371 S.C. 187, 194, 638 S.E.2d 667, 670 (2006))); *id.* at 52, 691 S.E.2d at 151 ("[A] trial judge shall review the constitutionality of a punitive damages award by determining whether the award was reasonable . . . ."); *Mitchell*, 385 S.C. at 584,

---

the water had been on the floor would be pure speculation."  *Id.* at 136, 518 S.E.2d at 830 (emphasis added).

[7] 257 S.C. at 80, 184 S.E.2d at 79 ("The phrases 'withered up' and 'mushed up', which were applied to the appearance of the small bit of peeling after it has been stepped upon by [the] plaintiff, are . . . insignificant.").

686 S.E.2d at 183 ("To the extent [a punitive damages] award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003))).

Within its discussion of the award's constitutionality, the circuit court found there was no evidence that Target "engaged in a pattern of reckless, willful, or wanton conduct that is sufficiently reprehensible to justify the punitive damages award." The circuit court also found that the ratio between the punitive damages award and the actual damages award was "in excess of 45:1." The circuit court concluded that the award violated Target's due process rights.

A. Supporting Evidence

"In order for a plaintiff to recover punitive damages, there must be evidence the defendant's conduct was willful, wanton, or in reckless disregard of the plaintiff's rights." *Taylor v. Medenica*, 324 S.C. 200, 221, 479 S.E.2d 35, 46 (1996). "A tort is characterized as reckless, willful or wanton if it was committed in such a manner or under such circumstances that a person of ordinary reason and prudence would have been conscious of it as an invasion of the plaintiff's rights." *Id.*[8] "A conscious failure to exercise due care constitutes willfulness." *Id.*

Here, the circuit court set aside the punitive damages award by way of a JNOV. The nature of a JNOV, which is "merely a renewal of [a] directed verdict motion,"[9] requires the circuit court to determine the existence of evidence to support the award and not its weight. *Curcio*, 355 S.C. at 320, 585 S.E.2d at 274; *cf. Fairchild v. S.C. Dep't of Transp.*, 398 S.C. 90, 101, 727 S.E.2d 407, 413 (2012) (holding the circuit court erred in granting a directed verdict on the issue of punitive damages and stating, "It is not the duty of a trial court to weigh the evidence. Viewing the evidence and its reasonable inferences in the light most favorable to

---

[8] *See also Geddings v. Atl. Coast Line R. Co.*, 91 S.C. 477, 75 S.E. 284, 286 (1912) ("Not only is the conscious invasion of the rights of another, in a wanton, willful, and reckless manner, an act of wrong, but [] the same result follows, *when the wrongdoer does not actually realize that he is invading the rights of another*, provided the act is committed in such a manner that a person of ordinary reason and prudence would say that it was a reckless disregard of another's rights." (emphasis added) (quoting *Tolleson v. Southern Ry. Co.*, 88 S.C. 7, 70 S.E. 311, 313 (1911))).
[9] *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 331, 732 S.E.2d 166, 171 (2012).

[the nonmoving party], as both the trial court and this [c]ourt are required to do, we hold there is evidence to create a jury question as to whether or not [the defendant] acted with recklessness, thus requiring submission of the issue of punitive damages to the jury"). "When considering a JNOV, 'neither [an appellate] court, nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony or the evidence.'" *Curcio*, 355 S.C. at 320, 585 S.E.2d at 274 (alteration in original) (quoting *Reiland*, 330 S.C. at 634, 500 S.E.2d at 154). "The jury's verdict must be upheld unless no evidence reasonably supports the jury's findings." *Id.*

Further, both the circuit court and this court are "required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to" the Garrisons, the nonmoving parties. *Williams Carpet*, 400 S.C. at 325, 734 S.E.2d at 180; *cf. Hollis v. Stonington Dev., LLC*, 394 S.C. 383, 393–94, 714 S.E.2d 904, 909–10 (Ct. App. 2011) ("When ruling on a directed verdict motion as to punitive damages, 'the circuit court must view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. In reviewing the denial of a motion for directed verdict . . . , the appellate court applies the same standard as the circuit court.'" (alteration in original) (citation omitted) (quoting *Mishoe v. QHG of Lake City, Inc.*, 366 S.C. 195, 200, 621 S.E.2d 363, 366 (Ct. App. 2005), *cert. denied* (Jan. 18, 2007)). "If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt," the verdict should be upheld. *Williams Carpet*, 400 S.C. at 325, 734 S.E.2d at 180 (quoting *Chaney*, 246 S.C. at 266, 143 S.E.2d at 523); *cf. Hollis*, 394 S.C. at 394, 714 S.E.2d at 910 ("The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton." (quoting *Mishoe*, 366 S.C. at 201, 621 S.E.2d at 366).

In *Mishoe*, the plaintiff injured her left ankle and right knee while walking across the pavement near the emergency room exit of the defendant's hospital and getting her left foot got caught in a hole. 366 S.C. at 199, 621 S.E.2d at 365. Although the hospital's head of maintenance had prepared a written report concerning the hole's existence approximately eleven months before the plaintiff's injury,[10] "[t]he hospital took no action to repair the hole or warn visitors and patients of the hole's existence." *Id.* This court concluded that this evidence was sufficient to submit the issue of the hospital's "willful, wanton, reckless, or malicious conduct to the jury." 366 S.C. at 202, 621 S.E.2d at 366.

---

[10] The hospital "was required to perform regular, twice-yearly safety inspections of its premises to maintain its accreditation." *Id.*

Notably, the hospital had argued that because there was no clear and convincing evidence that its actions constituted willful, wanton, or reckless conduct, the circuit court erred in denying its JNOV motion.[11]  366 S.C. at 200, 621 S.E.2d at 365.  In rejecting this argument, then-Chief Judge Hearn summarized the standard of review for a JNOV ruling on punitive damages as follows:

> On appeal from the denial of a motion for directed verdict or JNOV, *the appellate court may only reverse if there is no evidence to support the circuit court's ruling*.  Neither the circuit court nor the appellate court has the authority to decide credibility issues or resolve conflicts in testimony.  In order to receive an award of punitive damages, the plaintiff has the burden of proving by clear and convincing evidence the defendant's misconduct was willful, wanton, or with reckless disregard for the plaintiff's rights.[[12]]  A conscious failure to exercise due care constitutes willfulness.  When evidence exists that suggests a defendant is aware of a dangerous condition and does not take action to minimize or avoid the danger, *sufficient evidence exists to create a jury issue as to whether there is clear and convincing evidence of willfulness*.  The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton.

366 S.C. at 200–01, 621 S.E.2d at 366 (emphases added) (citations omitted).[13]

---

[11] The clear and convincing "measure of proof is intermediate, more than a mere preponderance but less than is required for proof beyond a reasonable doubt." *Peeler v. Spartan Radiocasting, Inc.*, 324 S.C. 261, 265 n.4, 478 S.E.2d 282, 284 n.4 (1996) (quoting *Middleton v. Johnston*, 273 S.E.2d 800, 803 (Va. 1981)).

[12] *See* S.C. Code Ann. § 15-33-135 (2005).

[13] *But see Taylor*, 324 S.C. at 221–22, 479 S.E.2d at 46 (holding the circuit court properly denied the defendant's motion for a JNOV on punitive damages because the record contained "clear and convincing evidence that [the defendant] failed to exercise due care in treating [the plaintiff]"); *Duncan v. Ford Motor Co.*, 385 S.C. 119, 138, 682 S.E.2d 877, 886 (Ct. App. 2009) (responding to the defendant's argument that the jury's punitive damages award should be "reversed" by stating that

Here, the Garrisons presented evidence showing that Target's employees were aware of the importance of inspecting and cleaning the parking lot to keep it safe for customers and of keeping good records of these efforts. The Garrisons also presented evidence showing that Target's employees should have been aware of the existence of the syringe and needle in the parking lot. Yet, immediately after Denise reported the injury to Target's manager, the employee assigned to the parking lot could not be located. The Garrisons also highlight the following evidence showing the falsity of Target's claim that it had the parking lot cleaned on a regular basis: Target's manager (Shelby Brintnall) and Property Maintenance Technician (Jonathan Jackson) both testified that a third-party vendor sent a cleaning truck to sweep Target's parking lot once a week, on every Thursday night. Brintnall and Jackson also testified that cart attendants regularly checked the lot for debris. Yet, Clint testified that he camped out in Target's parking lot on a Thursday night, from 11:45 p.m. to 5:30 a.m.,[14] and no one came to clean the lot.

Also belying Target's claim that it cleaned the parking lot on a regular basis were photographs of weathered trash and debris and the testimony of the Garrisons and Clint's mother that they had observed "trash everywhere" and other debris in Target's parking lot on different occasions. The Garrisons also maintain that an inspection log identifying both April 28, 2014, and April 29, 2014, as a Monday

---

clear and convincing evidence supported the award); *Longshore v. Saber Sec. Servs., Inc.*, 365 S.C. 554, 564, 619 S.E.2d 5, 11 (Ct. App. 2005) (responding to the defendant's argument that the jury's punitive damages award should be "reversed" by stating, "Although appellate review of an award of punitive damages is limited to the correction of errors of law, an award of punitive damages must be proven under a significant burden of proof: clear and convincing evidence"); *id.* at 564–65, 619 S.E.2d at 11 (holding the circuit court erred in submitting the issue of punitive damages to the jury because there was "no clear and convincing evidence that [the defendant's] conduct . . . was willful, wanton, or in reckless disregard of the rights of others"); *Welch*, 342 S.C. at 301–02, 536 S.E.2d at 419–20 (holding the circuit court did not err in denying the defendant's motion for a JNOV as to punitive damages because there was clear and convincing evidence of the defendant's reckless culpability).

[14] Clint explained that Target's counsel had previously intimated to him that the cleaning truck regularly arrived at the parking lot after midnight. Clint also listened to Jackson testify in his deposition that the truck arrived "on Thursday night and Friday mornings."

"suggested to the jury" that Jackson's testimony claiming to have conducted regular inspections was false.

When evaluating the above-referenced evidence of Target's failure to regularly inspect and clean its parking lot, the circuit court was charged with determining whether the circumstances were such that "a person of ordinary reason and prudence would have been conscious of [Target's conduct] as an invasion of the plaintiff's rights." *Taylor*, 324 S.C. at 221, 479 S.E.2d at 46. As we previously stated, the Garrisons assert that the circuit court conflated evidentiary sufficiency with constitutional excessiveness.[15] They express the concern that the circuit court failed to articulate the standard for evaluating a motion for a JNOV as to the award of punitive damages because the court's judgment was clouded by the amount of the jury's verdict. They highlight the inconsistency between the circuit court's JNOV and its initial denial of Target's directed verdict motion as to punitive damages, when it found sufficient evidence to support such an award: "[T]he [c]ourt finds that there is at least evidence that[,] when viewed in the light most favorable to the nonmoving party[,] could lead to more than one inference or at least cause an inference that is in doubt." We agree with this initial assessment by the circuit court. We also agree with the Garrisons' assertion that the circuit court lost sight of this principle after being confronted with the enormity of the jury's punitive damages award.

Based on the foregoing, we reverse the circuit court's JNOV as to the punitive damages award.

---

[15] In *Hundley ex rel. Hundley v. Rite Aid of S.C., Inc.*, this court set forth the following demarcation between evidentiary sufficiency and constitutional excessiveness:

> Our appellate decisions have heretofore recognized three stages for a trial court's review of punitive damages. *First, the court must determine whether the defendant's conduct rises to a sufficient level of culpability to submit the issue to the jury. . . .* Second, the court must conduct a post trial . . . review to evaluate whether the award deprives the defendant of due process. If the court concludes that the defendant's due process rights were violated, a new trial absolute or new trial *nisi remittitur* is required.

339 S.C. 285, 314, 529 S.E.2d 45, 60–61 (Ct. App. 2000) (emphasis added) (citations omitted).

B.  Amount of Award

After finding that the ratio between the punitive damages award and the actual damages award was in excess of 45:1, the circuit court stated, "This ratio should not stand in . . . light of the *Campbell* decision[] and cannot stand under the statutory cap placed on punitive damages . . . in [section] 15-32-530."  On appeal, the Garrisons argue that the amount of the punitive damages award was not excessive and, therefore, should not be reduced.  The Garrisons also argue Target waived the application of the punitive damages caps in section 15-32-530.  We will address these grounds in turn.

1.  Due Process

"[W]hile states possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards."  *Mitchell*, 385 S.C. at 584, 686 S.E.2d at 183 (quoting *Campbell*, 538 U.S. at 416).  In other words, "[b]ecause punitive damages are quasi-criminal in nature, the process of assessing punitive damages is subject to the protections of the Due Process Clause of the Fourteenth Amendment of the United States Constitution."  *Austin*, 387 S.C. at 52, 691 S.E.2d at 150 (quoting *James*, 371 S.C. at 194, 638 S.E.2d at 670).  "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property."  *Mitchell*, 385 S.C. at 584, 686 S.E.2d at 183 (quoting *Campbell*, 538 U.S. at 417).  To make this determination, trial courts must conduct a post-trial review of a jury's punitive damages award:

> [A] trial judge shall review the constitutionality of a punitive damages award by determining whether the award was reasonable under the following guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the amount of the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Austin*, 387 S.C. at 52, 691 S.E.2d at 151 (citing *Mitchell*, 385 S.C. at 587–88, 686 S.E.2d at 185–86).[16]  "[A]n appellate court reviews de novo the trial judge's application of these guideposts." *Id.*

In *Mitchell*, our supreme court examined a punitive damages award with a ratio of 13.9 to 1, based on the jury's $15 million punitive damages award and over $1 million in potential harm to the plaintiff, and concluded that it was "grossly excessive." 385 S.C. at 592, 686 S.E.2d at 187.  The court remitted the award to $10 million, resulting in a 9.2 to 1 ratio.[17]  *Id.* at 594, 686 S.E.2d at 188.  We will now apply the three *Gore* guideposts to the present case.

### a. Reprehensibility

> In terms of reprehensibility, [the court] should consider whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5) the harm was the result of intentional malice, trickery, or deceit, rather than mere accident.

*Austin*, 387 S.C. at 53, 691 S.E.2d at 151.

Here, the harm to Denise was physical because the needle from the syringe pricked her palm and drew blood, possibly exposing her to a communicable disease and requiring her to undergo difficult medical treatment resulting in physical and emotional suffering for several months.  The medications she had to take made her physically ill and caused vivid nightmares.  Further, the Garrisons had financial vulnerability because they had only Clint's modest income to support their household and Clint lost part of that income when he had to take time off from work to take care of Denise.[18]  As a result, Clint had to borrow money from his mother to pay for school lunches for the children.  Moreover, the Garrisons presented evidence

---

[16] These guideposts were first set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).

[17] The *Mitchell* opinion was issued before the punitive damages caps set forth in section 15-32-530 were enacted in 2011.

[18] Clint testified he was making $16.80 per hour for sixty-four hours per week at the time of Denise's injury.

showing that Target's parking lot was littered with trash and debris on a regular basis. Therefore, while the existence of the syringe and needle were known to happen on just one occasion, there is the potential for its recurrence or for other dangerous debris to harm customers.

### b. Ratio

"The ratio of actual or potential harm to the punitive damages award is 'perhaps the most commonly cited indicium of an unreasonable or excessive punitive damages award.'" *Mitchell*, 385 S.C. at 588, 686 S.E.2d at 185 (quoting *Gore*, 517 U.S. at 580).

> Although the [United States] Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," and has consistently declined to adopt a bright line ratio or simple mathematical test, the Court has remarked that "*in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages[] to a significant degree[] will satisfy due process*." Nevertheless, the Supreme Court has made clear that "there are no rigid benchmarks that a punitive damages award may not surpass," so long as "the measurement of punishment is both reasonable and *proportionate to the amount of harm to the plaintiff and the general damages recovered*." With this instruction in mind, we note that a court, when determining the reasonableness of a particular ratio of actual or potential harm to a punitive damages award, may consider: *the likelihood that the award will deter the defendant from like conduct*; whether the award is reasonably related to the harm likely to result from such conduct; and the defendant's ability to pay. Nevertheless, a court may not rely upon these considerations to justify an otherwise excessive punitive damages award.

*Id.* at 588, 686 S.E.2d at 185 (emphases added) (citations omitted) (quoting *Campbell*, 538 U.S. at 425–26).

"In reviewing the ratio guidepost, a court need not always compare the punitive damages award to the actual damages awarded, but in certain cases may compare it to the *potential* harm suffered by the plaintiff." *Id.* at 590, 686 S.E.2d at 187. In *TXO Production Corporation v. Alliance Resources*, the United States Supreme Court considered not only the potential harm to the plaintiff but also "the possible harm to other victims that might have resulted if similar future behavior were not deterred." 509 U.S. 443, 460 (1993) (quoted in *Mitchell*, 385 S.C. at 591, 686 S.E.2d at 187).

Here, the jury awarded only $100,000 to Denise to reflect the actual harm she experienced. However, the *potential* harm to Denise involved contracting a communicable disease such as HIV or hepatitis, along with the attendant medical costs and possible death. Further, Jonathan Jackson, Target's Property Maintenance Technician, testified that Target had not increased the frequency of its cleaning since the day of Denise's injury or made any improvements to its "safety scans" or its cleaning methods since the injury. Therefore, consideration should also be given to the possible harm to other customers or their children if Target is not adequately deterred.

The Garrisons point out that the ratio evaluated by our supreme court in *Mitchell* compared the plaintiff's potential harm, rather than the actual harm, to the punitive damages award in that case. In *Mitchell*, the plaintiff was diagnosed as HIV positive after he had purchased a health insurance policy from the defendant. 385 S.C. at 577–78, 686 S.E.2d at 180. After receiving claims for the plaintiff's treatment and testing, the defendant rescinded the policy on the basis that he had misrepresented his HIV positive status on his insurance application. *Id.* at 578–79, 686 S.E.2d at 180–81. When a case manager at the clinic visited by the plaintiff tried to inform the defendant's senior underwriter that the plaintiff did not test positive for HIV until after he purchased the policy, the underwriter "spurned" the case manager's offer to send the supporting records to her and stated "that there was nothing she could do" at that time. *Id.* at 579–80, 686 S.E.2d at 181.

The plaintiff filed an action for breach of contract and bad faith rescission against the defendant, and at trial, the plaintiff presented evidence of his actual and potential harm. *Id.* at 580–82, 686 S.E.2d at 181–82. The plaintiff

> presented testimony from a medical expert who testified that without medical treatment, he would contract AIDS in two years and likely die two years after that. [The plaintiff] introduced testimony from a health care expert

who testified to the minimum expected costs that it would take to care for [the plaintiff] throughout his life, not including complications from HIV and AIDS. [The plaintiff] also introduced an economist who relied on the health care expert's figures to project a total present value of $1,081,189.40 for [the plaintiff's] treatment and costs.

*Id.* at 581–82, 686 S.E.2d at 182. The jury awarded the plaintiff $186,000 in actual damages. *Id.* at 577, 686 S.E.2d at 179. While the jury awarded $15 million in punitive damages, the supreme court remitted this award to $10 million. *Id.* at 577, 594, 686 S.E.2d at 179, 188.

Although the ratio between the actual damages awarded and the remitted punitive damages award was approximately 54:1, the court determined the plaintiff's potential harm to be $1,081,189.40, the present value of costs for the evaluation and treatment of HIV over the plaintiff's lifetime, and compared that amount to both the $15 million award and the remitted $10 million award. *Id.* at 591–94, 686 S.E.2d at 187–88. The court held that the original 13.9:1 ratio was "grossly excessive" under due process standards but the ratio resulting from the remitted punitive damages award, 9.2 to 1, satisfied due process. *Id.* at 592–94, 686 S.E.2d at 187–88. The court noted that the defendant's conduct was "reprehensible enough to merit an award towards the outer limits of the single-digit ratio." *Id.* at 593, 686 S.E.2d at 188.

Unlike the plaintiff in *Mitchell*, Denise did not test positive for HIV, and the Garrisons did not present the testimony of a health care expert or economist to determine the economic cost to the Garrisons had Denise actually tested positive for HIV or hepatitis. Nonetheless, given the potential harm to Denise and other customers, more than just the $100,000 awarded in compensatory damages to Denise should be considered in comparison to the amount of punitive damages awarded. Further, the single-digit ratio formulated by the supreme court in *Mitchell* of 9.2 to 1 was based on a remitted award of $10 million, and the jury in the present case awarded less than half of that amount to Denise. Even after taking into account the greater reprehensibility of the defendant's conduct in *Mitchell* versus Target in the present case, the circuit court was incorrect in placing emphasis on the ratio of punitive damages to mere actual damages awarded (45:1). Therefore, we reverse the circuit court's conclusion stating "This ratio should not stand in . . . light of the *Campbell* decision . . . ."

The Garrisons also contend Target's counsel admitted in closing arguments that Target was a $73 billion dollar-a-year corporation at the time of trial and this wealth requires a punitive damages award to be large enough to have a deterrent effect on Target.[19] *See id.* at 588, 686 S.E.2d at 185 ("[A] court, when determining the reasonableness of a particular ratio of actual or potential harm to a punitive damages award, may consider: the likelihood that the award will deter the defendant from like conduct; whether the award is reasonably related to the harm likely to result from such conduct; and the defendant's ability to pay. Nevertheless, a court may not rely upon these considerations to justify an otherwise excessive punitive damages award."). We agree that the deterrent effect of the award is an important consideration. On the other hand, courts must exercise caution when considering the wealth of a defendant as part of a punitive damages review:

> trial courts must be careful about considering the net worth of the defendant. Wealth cannot justify an otherwise unconstitutional punitive damages award. While the ability to pay remains relevant to the post-judgment due process review, a punitive damages award should never be based solely on a percentage of the defendant's net worth.

*Id.* at 588 n.8, 686 S.E.2d at 185 n.8 (citation omitted).

### c. Comparable Cases

"When identifying 'comparable cases' a court may consider: the type of harm suffered by the plaintiff or plaintiffs; the reprehensibility of the defendant's conduct; the ratio of actual or potential harm to the punitive damages award; the size of the award; and any other factors the court may deem relevant." *Id.* at 588–89, 686 S.E.2d at 186. The Garrisons do not cite any cases that are truly comparable to the present case, and we have found none.

---

[19] Target's counsel did not exactly admit to the $73 billion figure. He stated that the Garrisons' counsel had referred to that amount "four or five times." Target's counsel then stated, "That's probably right. I don't know." The Garrisons do not cite to any evidence in the record to back up this figure. And while they also reference a federal opinion's identification of Target's net worth as $17.633 billion, this reference is not persuasive because the opinion was signed in 2009 and the trial in the present case was conducted in 2016. *Cantrell v. Target Corp.*, No. CV 6:06-2723-BHH, 2009 WL 10678353, at *13 (D.S.C. May 15, 2009). The court's net worth reference was actually $15.633 billion.

Based on the application of all three *Gore* guideposts to the record in the present case, we are compelled to conclude that the amount of the punitive damages award violates due process. Although the evidence supports moderate reprehensibility on Target's part, it is considerably less than the reprehensibility of the defendant's conduct in *Mitchell*. Further, while the ratio of the punitive damages awarded to the potential harm (versus mere actual harm) is likely much less than 45:1, the evidence does not allow us to precisely determine this ratio. Finally, there is a dearth of comparable cases to support the award in this case.

Therefore, we affirm the circuit court's conclusion that the punitive damages award violated due process but reverse the circuit court's specific conclusion that the ratio of 45:1 "should not stand in the light of the *Campbell* decision" given that the ratio of the punitive damages awarded to the *potential* harm to Denise and other customers is likely much less than 45:1. *See TXO*, 509 U.S. at 460 (considering not only the potential harm to the plaintiff but also "the possible harm to other victims that might have resulted if similar future behavior were not deterred"). We remand for a remittitur of the punitive damages award to an amount reasonably consistent with the circumstances of this case.

2. Statutory Cap

Section 15-32-530 sets forth the following caps on punitive damages. It states, in part:

> (A) Except as provided in subsections (B) and (C), an award of punitive damages may not exceed the greater of three times the amount of compensatory damages awarded to each claimant entitled thereto or the sum of five hundred thousand dollars.
>
> (B) The limitation provided in subsection (A) may not be disclosed to the jury. If the jury returns a verdict for punitive damages in excess of the maximum amount specified in subsection (A), the trial court should first determine whether:
>
>> (1) the wrongful conduct proven under this section was *motivated primarily by unreasonable financial gain* and determines that *the unreasonably*

*dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was known or approved by the managing agent, director, officer, or the person responsible for making policy decisions on behalf of the defendant*; or

(2) *the defendant's actions could subject the defendant to conviction of a felony* and that act or course of conduct is a proximate cause of the plaintiff's damages;

If the trial court determines that either item (1) or (2) apply, then punitive damages must not exceed the greater of four times the amount of compensatory damages awarded to each claimant entitled thereto or the sum of two million dollars and, if necessary, the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount allowed by this subsection. If the trial court determines that neither item (1) or (2) apply, then the award of punitive damages shall be subject to the maximum amount provided by subsection (A) and the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount allowed by subsection (A).

(C) However, when the trial court determines one of the following apply, there shall be no cap on punitive damages:

(1) at the time of injury *the defendant had an intent to harm* and determines that the defendant's conduct did in fact harm the claimant; or

(2) *the defendant has pled guilty to or been convicted of a felony arising out of the same act* or course of conduct complained of by the plaintiff and that act or course of conduct is a proximate cause of the plaintiff's damages; or

(3) the defendant acted or failed to act *while under the influence of alcohol, drugs*, other than lawfully prescribed drugs administered in accordance with a prescription, *or any intentionally consumed glue, aerosol, or other toxic vapor to the degree that the defendant's judgment is substantially impaired*.

(emphases added).

### a. Waiver

The Garrisons assert that by failing to raise section 15-32-530 as an affirmative defense in its responsive pleadings, Target waived the application of the punitive damages caps in this statute.[20]  As set forth above, the statute designates

---

[20] This issue is preserved for review.  Counsel extensively argued the issue in the post-trial motions hearing, and the circuit court expressly concluded in its written order that the punitive damages award could not stand under section 15-32-530. *Cf. Spence v. Wingate*, 381 S.C. 487, 489, 674 S.E.2d 169, 170 (2009) ("We hold the Court of Appeals erred in finding the issue was not preserved for appeal.  The trial judge's order granted respondents' motion for summary judgment on *precisely* the grounds argued by respondents at the summary judgment hearing [that there existed no attorney-client relationship between respondents and petitioner; therefore, respondents owed no duty to petitioner].  While that order did not restate the ground on which petitioner opposed the motion—a duty based on the existence of a prior attorney-client relationship—the order explicitly addresses that argument by ruling respondents 'owed no duty or obligation' to petitioner. This ruling is sufficient to preserve petitioner's argument that respondents owed a duty to petitioner, and petitioner was not required to file a Rule 59(e) motion to alter or amend in order to preserve the issue for appeal.").  Even if there is some doubt as to preservation, we note Target has not asserted in its brief that this question is unpreserved. *See Atl. Coast Builders & Contractors, LLC v. Lewis*, 398 S.C. 323, 333, 730 S.E.2d 282, 287 (2012), Toal, C.J. (concurring in result in part and dissenting in part) ("[W]here the question of preservation is subject to multiple interpretations, any doubt should be resolved in favor of preservation.  When the opposing party does not raise a preservation issue on appeal, courts are not precluded from finding the issue unpreserved if the error is clear.  However, the silence of an adversary should serve as an indicator to the court of the obscurity of the purported procedural flaw.").  Therefore, we resolve any possible doubt as to preservation in favor of the Garrisons on this important question.

more than one cap based on the circuit court's determination concerning the precise nature of the defendant's conduct and the underlying intent. Because the statute's language as a whole necessarily affects the proof at trial, the Garrisons argue that they would have presented more evidence concerning Target's prioritization of profits over safety had they known Target was going to invoke the punitive damages caps.

Rule 8(c) of the South Carolina Rules of Civil Procedure (SCRCP) provides,

> In pleading to a preceding pleading, a party *shall* set forth affirmatively the defenses: accord and satisfaction, arbitration and award, assumption of risk, condonation, contributory negligence, discharge in bankruptcy, duress, fraud, illegality, injury by fellow servant, laches, license, misrepresentation, mistake, payment, *plene administravit* or the administration of the estate is closed, recrimination, release, res judicata, statute of frauds, statute of limitations, waiver, *and any other matter constituting an avoidance or affirmative defense.*

(emphases added).[21] The note to Rule 8(c) states that its aim is "to avoid the 'surprise' defenses permissible under the old general denial answer" and it is the same as Rule

---

[21] This court described the nature of an affirmative defense in *O'Neal v. Carolina Farm Supply of Johnston, Inc.*:

> An affirmative defense conditionally admits the allegations of the complaint, but asserts new matter to bar the action. In other words, it assumes all elements of the plaintiff's case have been established. Because the plaintiff is taken to have proved a good cause of action, the burden of proof shifts to the defendant to show he is not liable. On the other hand, where the defendant pleads special matter that denies an element of the plaintiff's cause of action, the defense is not affirmative and the burden of proof remains on the plaintiff to establish his case.

279 S.C. 490, 494, 309 S.E.2d 776, 779 (Ct. App. 1983) (citation omitted). Further, an avoidance, which also falls within Rule 8(c)'s pleading requirement, is defined as

8(c) of the Federal Rules of Civil Procedure, with the exception of "some affirmative defenses added to the list as a guide." Rule 8(c), *Note*. Therefore, we find federal cases interpreting the federal rule to be persuasive. *See Senate by & through Leatherman v. McMaster*, 425 S.C. 315, 323–24, 821 S.E.2d 908, 912 (2018) (citing *Unisun Ins. v. Hawkins*, 342 S.C. 537, 542, 537 S.E.2d 559, 561–62 (Ct. App. 2000) for the proposition that when a state rule has adopted the language of a federal rule, federal cases interpreting the federal rule are persuasive).

Similar to the purpose of our Rule 8(c), the purpose of the federal rule "is to inform the court and the parties how the case will be tried." *Simon v. United States*, 891 F.2d 1154, 1158 (5th Cir. 1990) (quoting *Morris v. Homeco International*, 853 F.2d 337, 342 (5th Cir. 1988)). Accordingly, some federal courts treat an issue as an affirmative defense if requiring the defendant to plead the issue is necessary to avoid unfair surprise to the plaintiff. *See In re ZAGG Inc. S'holder Derivative Action*, 826 F.3d 1222, 1231 (10th Cir. 2016) ("[W]e agree with the Third Circuit that in determining whether an issue should be treated as an affirmative defense for purposes of pleading, the critical question (absent a contrary command by statute or rule, such as the list of affirmative defenses in Rule 8(c)) is whether requiring the defendant to plead the matter is necessary 'to avoid surprise and undue prejudice by providing the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed.'" (quoting *In re Sterten*, 546 F.3d 278, 285 (3d Cir. 2008))).

"Central to requiring the pleading of affirmative defenses is the prevention of unfair surprise. A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense." *Ingraham*, 808 F.2d at 1079 (quoting *Bettes v. Stonewall Ins. Co.*, 480 F.2d 92, 94 (5th Cir. 1973)). Although *Bettes* is not a Rule 8(c) case, the court's approach to the concept of unfair surprise is instructive. The Fifth Circuit examined an insured's request to modify a pre-trial order to "include, as a contested issue of law," whether his insurer had complied with a statute requiring insurers who rely on a misrepresentation defense to "show on trial that within 90 days of learning of the falsity of any such representation[,] it notified the insured that it refused to be bound by the policy." 480 F.2d at 93. The court characterized the request as "an eleventh-hour appeal to the district court made only after other trial tactics had failed," noting, "[t]he pleadings had been completed, the

---

"the allegation or statement of new matter, in opposition to a former pleading, which, admitting the facts alleged in such former pleading, shows cause why they should not have their ordinary legal effect." *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987) (quoting Black's Law Dictionary (5th ed. 1979)).

discovery concluded, the pre-trial order entered, the evidence taken, the charge conference held, the arguments to the jury finished, the jury charged, and the objections to the charge made before [the insured] sought this modification of the pre-trial order to show his intent to rely on [the misrepresentation statute]." *Id.* (footnotes omitted). The court took a realistic approach to the concept of unfair surprise:

> *Although [the insurer] was aware of the existence of [the misrepresentation statute], it was entitled to be surprised*, as was the district court, when [the insured] sought to inject it as a legal issue minutes before the case finally went to the jury. Any detriment to [the insured] caused by denying the proposed amendment to the pre-trial order was occasioned by his own actions.

480 F.2d at 94 (emphasis added). The court further stated,

> [The insured] was promptly put on notice by [the insurer's] answer that the [insurer] intended to rely on a misrepresentation defense, but at no time subsequently was the issue of notice as an element of that defense clearly drawn. In such a case, even with the ultimate burden of proof potentially on his opponent, a litigant cannot strategically lie behind the log until after the trial and receipt of evidence, argument, and charge to the jury before raising an issue not found in the pleadings nor included in the pre-trial order and then raise it when it is too late for his opponent to do anything about it. The manifest prejudice of such tactics would make a shambles of the efficacy of pre-trial orders and a fair trial.

*Id.*

Given the concerns over unfair surprise that underlie both the state and federal rules, it logically follows that a defendant's failure to plead an affirmative defense or avoidance as required by Rule 8(c) "is deemed a waiver of the right to assert it." *Earthscapes Unlimited, Inc. v. Ulbrich*, 390 S.C. 609, 615, 703 S.E.2d 221, 224 (2010) (quoting *Whitehead v. State*, 352 S.C. 215, 220, 574 S.E.2d 200, 202 (2002)). We acknowledge that courts may overlook a defendant's failure to plead an affirmative defense when it "is timely raised to the trial court without resulting in

unfair surprise to the opposing party."[22]  However, courts will enforce the pleading requirement when a statutory liability limit such as section 15-32-530 affects the proof to be presented at trial.  *See infra*.  A plaintiff lacking notice that a defendant will rely on such a statute is unlikely to conduct the discovery or other investigation necessary to obtain proof overcoming the statutory limit.  *Cf. Westfarm Assocs. Ltd. P'ship v. Int'l Fabricare Inst.*, 846 F. Supp. 439, 441 (D. Md. 1993), *aff'd sub nom. Westfarm Assocs. Ltd. P'ship v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir. 1995) (discussing the plaintiff's and third-party plaintiff's argument that they would be prejudiced if the third-party defendant was allowed to assert the damages cap in the Maryland Local Government Tort Claims Act after judgment was entered on a jury verdict for the plaintiff and noting as "valid considerations" the contentions that had they known the third-party defendant would assert the damages cap, they would have planned their discovery and trial presentations to address the cap).  Constraints of time and money may compel the plaintiff to seek out only the information that is relevant to what she knows will be an issue at trial or during post-trial motions.  The extra expense for "gunfire" often cannot be justified if lesser means will do.  Implicitly recognizing that a plaintiff does not know what she does not know, courts enforcing the pleading requirement quite reasonably treat the defendant's failure to invoke a statutory liability limit in a timely manner as inherently prejudicial.  *See infra*.

The Garrisons cite *James v. Lister*, 331 S.C. 277, 284, 500 S.E.2d 198, 202 (Ct. App. 1998), *cert. denied* (Mar. 5, 1999), for the proposition that South Carolina law requires any liability limits affecting the proof at trial to be pled as an affirmative defense.  In *James*, this court relied on prior South Carolina opinions requiring matters to be pled when they "may prejudice the opposing party *by introducing issues [that] may affect the proof at trial*."  *Id.* at 283, 500 S.E.2d at 201 (emphasis added).  The court referenced *Washington v. Whitaker*, in which our supreme court held that sovereign immunity must be affirmatively pled,[23] and *Niver v. South Carolina Department of Highways and Public Transportation*, in which this court held that, under the South Carolina Tort Claims Act (SCTCA), "[t]he burden of establishing a limitation upon liability or an exception to the waiver of immunity is upon the governmental entity asserting it as an affirmative defense."[24] *Id.*  The court noted that in *Washington*, sovereign immunity was asserted as a defense to punitive damages rather than as a complete bar to the plaintiff's claim.  *Id.* at 283, 500 S.E.2d at 201–02.  The court also noted, "[t]he cases requiring the SCTCA to be pled as an

---

[22] *Plyler v. Burns*, 373 S.C. 637, 648, 647 S.E.2d 188, 194 (2007).

[23] 317 S.C. 108, 114–15, 451 S.E.2d 894, 898 (1994).

[24] 302 S.C. 461, 463, 395 S.E.2d 728, 730 (Ct. App. 1990).

affirmative defense do not differentiate between claims in which the defense may act as a complete bar and claims in which the defense merely limits liability," citing *Niver* and *Rakestraw v. South Carolina Department of Highways and Public Transportation*, 323 S.C. 227, 473 S.E.2d 890 (Ct. App. 1996). *Id.* at 283–84, 500 S.E.2d at 202.

The *James* court concluded the view of the majority of other jurisdictions that a statutory recovery limit affecting the proof at trial constitutes an affirmative defense was consistent with South Carolina law:

> only a few cases in other jurisdictions hold a statutorily mandated recovery limit [that] requires additional proof at trial does not constitute an affirmative defense. A far greater number of jurisdictions have concluded either that 1) a limit on recovery must be plead as an affirmative defense or 2) a recovery limit could constitute an affirmative defense if the limit affects proof at trial. Given the current holdings in *Washington*, *Niver*, and *Rakestraw*, we believe the view [that] requires the pleading of liability limits that affect proof at trial is consistent with South Carolina law.

331 S.C. at 284, 500 S.E.2d at 202. The court also concluded that the statute imposing a cap on recovery against a charitable organization *did not automatically place the plaintiff on notice* that the defendant would invoke the cap as a defense:

> Although charitable status is not a jury issue, the invocation of this protection triggers alternative remedies for the injured plaintiff. Section 33–55–210(A) provides a mechanism for seeking damages in excess of the charitable limitation, through an action against a charitable organization's employees.[25] In such instances, the statute specifically requires joinder of the employee as a party, and *a special finding by the jury that the employee was proved guilty of gross negligence as a proximate cause of the injury*. Indirectly, then, [the defendant's] failure to raise its charitable status as an affirmative defense affected

---

[25] This provision now appears in section 33-56-180 of the South Carolina Code (2006).

> both the parties to the action and the manner in which the
> case was tried to the jury, including what issues were or
> were not presented to them for resolution.

331 S.C. at 282, 500 S.E.2d at 201 (emphasis added).[26]  Likewise, the exceptions to the damages cap Target seeks to apply to the present case, as found in section 15-32-530, require special findings relating to, *inter alia*, unreasonable financial gain as a motivation for the wrongful conduct or the defendant's intent to harm.  § 15-32-530(B), (C).  Evidence of these facts may or may not be introduced at trial in the absence of the defendant's pre-trial assertion of the punitive damages cap.  Therefore, it is unfair and unrealistic to assume that such evidence will always be introduced in any given case even in the absence of a damages cap.  It is also unfair to assume in the present case that such evidence would have been introduced had the underlying facts actually existed.

In stark contrast to section 15-32-530, the damages cap in the Tort Claims Act does not require any special findings that would affect the proof at trial.  Section 15-78-120 of the South Carolina Code (2005) simply imposes a $300,000 recovery cap per person and a $600,000 cap for the total sum recovered arising out of a single occurrence and prohibits the recovery of punitive damages.  Hence, it comes as no surprise that this court excused the failure of the defendant in *Parker v. Spartanburg Sanitary Sewer District* to initially plead this cap.  362 S.C. 276, 280–85, 607 S.E.2d

---

[26] In the absence of a statute's creation of an issue that may affect the proof at trial, our appellate courts have not been consistent as to whether a statute's effect on a private lawsuit must be pled as an affirmative defense.  *Compare In re Estate of Hover*, 407 S.C. 194, 206–08, 754 S.E.2d 875, 881–82 (2014) (contrasting the Probate Code's nonclaim statute, which  eliminates a claimant's right of action against a decedent's estate upon noncompliance and, in turn, deprives the court of the power to adjudicate the claim, with general statutes of limitations, under which a claim is barred only if the statute is raised as an affirmative defense) *with Earthscapes*, 390 S.C. at 615, 703 S.E.2d at 224 (holding that a statutory prohibition against an unlicensed construction contractor bringing an action to enforce a contract was "in the nature of an affirmative defense precluding enforcement of a contract and should be pled"); *see also Broome v. Watts*, 319 S.C. 337, 342, 461 S.E.2d 46, 49 (1995) (holding that statutorily mandated set-off was not an affirmative defense that had to be pled because, *inter alia*, it "was not a matter properly triable to the jury"); *Parker v. Spartanburg Sanitary Sewer District*, 362 S.C. 276, 285, 607 S.E.2d 711, 716 (Ct. App. 2005) (holding that the Tort Claims Act's damages cap did not have to be pled as an affirmative defense because it was "self-executing").

711, 713–16 (Ct. App. 2005). Likewise, the statute governing underinsured motorist (UIM) coverage interpreted by our supreme court in *Broome v. Watts*, section 38-77-160 of the South Carolina Code (2015), does not require any special findings that would affect the proof at trial. Rather, the statute simply states that automobile insurance carriers must offer UIM coverage to their insureds "to provide coverage in the event that damages are sustained in excess of the liability limits carried by an at-fault insured or underinsured motorist." *Id.*

In addition to this court's opinion in *James*, federal opinions interpreting Rule 8(c) of the Federal Rules of Civil Procedure are instructive and persuasive. We rely on not only those federal opinions cited in *James* but also more recent federal opinions explaining when the failure to plead a statutory limit on damages constitutes a waiver of that limit.

First, we further expound the Fifth Circuit Court of Appeals' reasoning in *Ingraham v. United States*. The court gave credence to the same argument that the Garrisons make in the present case, i.e., "had they known the [Texas statutory limit on medical malpractice damages] would be applied, they would have made greater efforts to prove" damages that "were not subject to the statutory limit." 808 F.2d at 1079. The court concluded that the statutory damages limit was an affirmative defense that had to be "pleaded timely" and that the defendant in that case had waived the defense. *Id.* The court explained,

> We view the limitation on damages as an "avoidance" within the intendment of the residuary clause of 8(c). Black's Law Dictionary, 5th ed. 1979, defines an avoidance in pleadings as "the allegation or statement of new matter, in opposition to a former pleading, which, admitting the facts alleged in such former pleading, shows cause why they should not have their ordinary legal effect." Applied to the present discussion, a plaintiff pleads the traditional tort theory of malpractice and seeks full damages. The defendant responds that assuming recovery is in order under the ordinary tort principles, because of the new statutory limitation, the traditional precedents "should not have their ordinary legal effect."

*Id.*

Three years later, the Fifth Circuit examined a Louisiana statute limiting recovery in medical malpractice actions and held that this statutory recovery limit was an affirmative defense. *Simon*, 891 F.2d at 1157. The court recognized that the statute's applicability "involve[d] more than just a pure issue of law." *Id.* at 1159. In 2001, the Fifth Circuit once again explained the concept of waiving an affirmative defense in terms of preventing unfair surprise to the opposing party:

> Although failure to raise an affirmative defense under rule 8(c) in a party's first responsive pleading "generally results in a waiver . . . , [when] the matter is raised in the trial court in a manner that does not result in unfair surprise . . . technical failure to comply precisely with Rule 8(c) is not fatal." Thus, *a defendant does not waive an affirmative defense if he "raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond*."

*Giles v. Gen. Elec. Co.*, 245 F.3d 474, 491–92 (5th Cir. 2001) (emphasis added) (citation omitted) (alterations in original) (quoting *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983)). In *Lucas v. United States*, the Fifth Circuit held that the defendant raised the Texas statutory cap on malpractice damages at a "pragmatically sufficient time" and the plaintiff was not prejudiced by the defendant's failure to reference the cap in its pleading because the issue was raised at trial "immediately following testimony of the economist regarding the present value of [the plaintiff's] damages" and the statute did not affect the plaintiff's proof of damages. 807 F.2d 414, 418 (5th Cir. 1986). The court noted, "the applicability of the Texas statutory cap on malpractice damages is purely a legal issue [that] *can be resolved without the need for factual proof*." *Id.* (emphasis added).

In *Jakobsen v. Massachusetts Port Authority*, the First Circuit held the defendant waived the application of a Massachusetts statute limiting the liability of municipal corporations to $5,000 by waiting to invoke the statute until it made a directed verdict motion at trial. 520 F.2d 810, 813 (1st Cir. 1975). In applying Rule 8(c), FRCP, to the statute, the court stated, "While a statutory limitation on liability is not enumerated among the listed defenses, we think it falls within the Rule's residuary clause." *Id.* The court also explained that while the failure to plead an affirmative defense waives the defense, "when there is no prejudice and when fairness dictates, the strictures of this rule may be relaxed. Under Rule 15[, FRCP,] the district court may and should liberally allow an amendment to the pleadings if

prejudice does not result." *Id.* Nonetheless, the court found the plaintiff would be prejudiced by treating the defendant's late invocation of the statute as a late amendment of its answer in that particular case:

> As for treating the untimely defense as a late amendment that should have been allowed, it presented issues of such complexity and fundamental importance to the conduct of the litigation that both plaintiff and the court could not, in fairness, be forced to forego the advance notice they were entitled to under Rule 8(c).

*Id.* at 813–14. The court explained,

> While the Federal Rules reflect a universal trend away from stereotyped pleading, they do not presage abandonment of the requirements that parties be given reasonable advance notice of the major issues to be raised. Issues of this magnitude are not to be tossed at one's opponent in a jury trial just before the charge . . . .
>
> . . .
>
> The delay undercut plaintiff's ability to develop facts and fashion his case in a manner relevant to this defense. It also prejudiced the judge's ability to focus on the facts as they unfolded so as to rule properly on the claim . . . .

*Id.* at 815–16.

Almost twenty years later, the First Circuit held that a defendant waived the application of a Massachusetts statute allowing for contractual limitations of remedies under the state's commercial code by failing to timely invoke the statute. *See Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir. 1994). The court cited *Jakobsen* when it noted, "We have previously held that a statutory provision limiting damages to a fixed sum constituted an affirmative defense for purposes of Rule 8(c)." *Id.* The court also explained, "The reason why affirmative defenses under Rule 8(c) must be pled in the answer is to give the opposing party notice of the defense and a chance to develop evidence and offer arguments to controvert the defense." *Id.* The court noted that in the case before it, "the limitation of remedies issue was not raised until virtually the end of the liability

trial, *after discovery and the submission of all of the evidence on liability*." *Id.* at 1226–27 (emphasis added).

Moreover, the United States District Court for the District of Maryland relied on *Jakobsen* in holding that the Maryland Local Government Tort Claims Act was an avoidance that the defendant "was required to plead affirmatively." *Westfarm*, 846 F. Supp. at 440. Likewise, the Tenth Circuit has treated the failure to plead a statutory damages limit as a waiver. In *Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs*, the court characterized the damages cap in the Oklahoma Governmental Tort Claims Act as an affirmative defense and held that the defendant waived the cap because it first invoked it in a motion to alter or amend the judgment. 41 F.3d 600, 604 (10th Cir. 1994). The court explained,

> Permitting the [defendant] to raise this issue at this stage of the proceedings would be extremely unfair to [the plaintiff], who may have been able to prove some exception to the damage cap at trial if he had notice of the defense. Thus, assuming the [Oklahoma Governmental Tort Claims Act] applied to this action, counsel for the [defendant] waived any limit on its liability afforded by that statute by failing to raise the issue in its answer, the Pre–Trial Order, or at trial.

41 F.3d at 605.

In *Taylor v. United States*, the Ninth Circuit held that a statutory limit on noneconomic damages in medical malpractice cases was not an affirmative defense. 821 F.2d 1428, 1433 (9th Cir. 1987). Yet, the court acknowledged that application of the statute "may in some instances require resolution of factual issues" and that in such a case, a plaintiff could be prejudiced if the defendant does not invoke the statutory limitation prior to judgment.[27] *Id.* The court concluded that in the case before it, application of the statute required no additional factual inquiry. *Id.* The

---

[27] In *Hernandez v. Cty. of Monterey*, the United States District Court for the Northern District of California stated, in dicta, that a defense "targeting the amount of the recovery is a limitation rather than an affirmative defense," relying on the Ninth Circuit's opinion in *Taylor* as authority without recognizing the Ninth Circuit's acknowledgement of the obligation to invoke a statutory limitation prior to judgment when application of the limitation requires resolution of factual issues. 306 F.R.D. 279, 285 (N.D. Cal. 2015).

United States Supreme Court denied certiorari in this case, but Justice White wrote a brief dissent highlighting *Taylor*'s conflict with the First Circuit's decision in *Jakobsen* and the Fifth Circuit's decision in *Ingraham*. 485 U.S. 992, 992–93 (1988) (White, J., dissenting).

State court opinions have likewise acknowledged that a defendant can waive the application of a statutory limitation on damages when the defendant fails to invoke the limitation in time for the plaintiff to present proof in opposition to the limitation. In *Keene v. Brigham & Women's Hosp., Inc.*, the Supreme Judicial Court of Massachusetts stated that a statutory damages cap for charitable corporations was "treated as an affirmative defense that must be pleaded" although it was "technically a limitation on liability." 786 N.E.2d 824, 836 (Mass. 2003). The court explained, "Factual matters related to the cap may need to be determined by the fact finder, with the burden on the defendant to prove both that it is a charitable organization and that the tort complained of fell within the range of activities covered by the cap." *Id.* The court further stated, "The requirement that it be raised as an affirmative defense in such circumstances prevents unfair surprise, a key focus of the requirement of pleading affirmative defenses, and resulting prejudice to the plaintiff." *Id.* The court concluded that the defendant in that case raised the statutory cap "in a timely manner" and the plaintiff made no claim of surprise. *Id.* at 837; *see also Pressler v. Irvine Drugs, Inc.*, 169 Cal. App. 3d 1244, 1248, 215 Cal. Rptr. 807, 809 (Ct. App. 1985) (referring to California's statutory cap on noneconomic damages in medical malpractice cases as an affirmative defense and holding the defendant did not waive the defense by failing to request special interrogatories).

Target cites *Zorrilla v. Aypco Construction II, LLC*, in which the Supreme Court of Texas held that the state's single statutory cap on punitive damages did not "bear the characteristics of an affirmative defense or avoidance" because it did not "require proof of any additional fact to establish its applicability." 469 S.W.3d 143, 157 (Tex. 2015). The court emphasized that the statute applied automatically unless a case fell within the statute's exclusions for conduct described as a felony in certain sections of the state's penal code *if* the conduct was committed knowingly or intentionally. *Id.* (citing Tex. Civil Practice & Remedies Code Ann. § 41.008(c)). Although the statute was silent as to the burden of proof, the court interpreted the statute to place the burden on the plaintiff to show that a case fell within one of the exclusions. *Id.* The court concluded that because the statute did not place the burden of proof on the defendant, it was not an affirmative defense or avoidance that the defendant was required to plead. *Id.* The court also stated that because the statutory cap automatically applied, there was "little concern that plaintiffs will be genuinely surprised by its application." *Id.*

While *Zorrilla* may have logical appeal, our own precedent in *James* and the above-referenced persuasive federal court opinions disregard the fiction that a plaintiff is automatically on notice that a defendant will invoke a statutory damages cap to limit a jury's award.[28] These opinions focus on whether a statutory damages cap affects the proof at trial rather than which party has the burden of proof under the statute—no matter who has the burden, the plaintiff must be prepared for the defendant to place the issue before the finder of fact. In fact, the *James* court acknowledged that the plaintiffs in that case would carry the burden of proving gross negligence in order to recover damages in excess of the statutory cap: "The [plaintiffs] had no notice that another party was necessary and that they would be required to prove a greater degree of negligence in order to recover damages in excess of $200,000." 331 S.C. at 282, 500 S.E.2d at 201. To adopt the reasoning of *Zorrilla* would require us to contradict *James*, which we are unwilling to do, especially given its more realistic approach to the application of Rule 8(c).

With these considerations in mind, we return to South Carolina's statute, which begins with a reference to circumstances supporting either a two million dollar cap or no cap at all: "*Except as provided in subsections (B) and (C)*, an award of punitive damages may not exceed the greater of three times the amount of compensatory damages awarded to each claimant entitled thereto or the sum of five hundred thousand dollars." (emphasis added). Two successive events trigger the application of a higher cap set forth in subsection (B), i.e., "the greater of four times the amount of compensatory damages awarded to each claimant entitled thereto or the sum of two million dollars": (1) the jury returns a verdict exceeding the maximum amount specified in subsection (A) and (2) the trial court determines that one of the following two set of circumstances existed:

> (1) the wrongful conduct . . . was motivated primarily by unreasonable financial gain and . . . the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was known or approved by the managing agent, director, officer, or the person

---

[28] One exception is the Fifth Circuit's recognition that when a damages cap is an integral part of a statutory scheme under which the plaintiff seeks relief, the plaintiff cannot claim unfair surprise by the defendant's failure to plead the statutory cap. *See Giles*, 245 F.3d at 491 n.32 (citing *Oliver v. Cole Gift Ctrs., Inc.*, 85 F. Supp. 2d 109, 111–12 (D. Conn. 2000)).

responsible for making policy decisions on behalf of the defendant; or

(2) the defendant's actions could subject the defendant to conviction of a felony and that act or course of conduct is a proximate cause of the plaintiff's damages.

§ 15-32-530(B).

However, subsection (C) provides "there shall be no cap on punitive damages" when the trial court determines that one of the following three sets of circumstances applies to the case: (1) "the defendant had an intent to harm and . . . the defendant's conduct did in fact harm" the plaintiff; (2) the defendant was convicted of a felony arising out of the same act and the act proximately caused the plaintiff's damages; or (3) the defendant was "substantially impaired" by a substance "other than lawfully prescribed drugs administered in accordance with a prescription." § 15-32-530(C). In the absence of a requirement for a separate post-trial evidentiary hearing to submit this proof, we interpret the statute's plain language to require the trial court to make these special findings based on the proof presented to the jury at trial. *See State v. Johnson*, 396 S.C. 182, 188, 720 S.E.2d 516, 520 (Ct. App. 2011) ("In interpreting a statute, the court will give words their plain and ordinary meaning[] and will not resort to forced construction that would limit *or expand* the statute." (emphasis added)).

Similar to the *Zorrilla* court's analysis of the Texas statutory cap on punitive damages, Target argues South Carolina's $500,000 punitive damages cap applies automatically unless the circuit court makes the above-referenced determinations required by subsection (B) or subsection (C). However, unlike the structure of the Texas statute, Tex. Civil Practice & Remedies Code Ann. § 41.008, which sets forth one absolute cap in subsection (b) and separately addresses exclusions from the statute's application in subsection (c), the structure of South Carolina's statute denotes from the outset the fact that the $500,000 cap does not automatically apply: "*Except as provided in subsections (B) and (C)*, an award of punitive damages may not exceed the greater of three times the amount of compensatory damages awarded to each claimant entitled thereto or the sum of five hundred thousand dollars." § 15-32-530(A) (emphasis added). By beginning the statute with a reference to circumstances supporting either a $2 million cap or no cap at all, the legislature made it clear that it did not intend to make the $500,000 cap automatically applicable. *See Fox v. Moultrie*, 379 S.C. 609, 614, 666 S.E.2d 915, 917 (2008) ("In determining the

plain meaning of a statute, the courts must look at the particular statutory language at issue and the language and design of the statute as a whole.").

In sum, the criteria of section 15-32-530 undoubtedly "affect [the] proof at trial,"[29] thus distinguishing section 15-32-530 from other South Carolina statutes that do not invoke the functions of a fact finder or affect the proof at trial.[30]   Like the Louisiana statute examined in *Simon*, section 15-32-530 involves "more than just a pure issue of law."  891 F.2d at 1159.  To develop the evidence necessary to invoke one of the two alternatives to the $500,000 cap, a plaintiff must first obtain the evidence through extra discovery or other investigative measures—measures that are less likely to unfold without prior notice that the defendant will raise the cap as an issue before the circuit court.  Again, we note section 15-32-530 does not provide for a separate post-trial evidentiary hearing to submit evidence pertaining to the factors set forth in subsections (B) and (C).  We interpret section 15-32-530 to require the circuit court to make a determination under subsections (B) or (C) based on the evidence presented to the jury at trial.

Therefore, we conclude that Target was required to plead the recovery limits in section 15-32-530 or, at the very least, raise the defense prior to the conclusion of discovery so that the Garrisons would have had prior notice of the additional evidence they needed to lift the punitive damages limit.[31]  Because Target failed to do so, fairness dictates that we deem the application of the statutory damages limit to this case waived.  *See James*, 331 S.C. at 286, 500 S.E.2d at 203 (holding that the trial court did not abuse its discretion in denying the defendant's motion to amend its

---

[29] *James*, 331 S.C. at 284, 500 S.E.2d at 202.

[30] *See supra* n. 26; *cf. Parker*, 362 S.C. at 285, 607 S.E.2d at 716 (holding that the Tort Claims Act's damages cap did not have to be pled as an affirmative defense because it was "self-executing"); S.C. Code Ann. § 15-78-120(a)(1) (2005) (providing only that a person's recovery of damages in an action brought under the Tort Claims Act is limited to $300,000 "because of loss arising from a single occurrence regardless of the number of agencies or political subdivisions involved"); S.C. Code Ann. § 15-78-30(g) (2005) (defining "occurrence" as "an unfolding sequence of events [that] proximately flow from a single act of negligence").

[31] *See James*, 331 S.C. at 282–83, 500 S.E.2d at 201 (holding that the defendant's "failure to raise its charitable status as an affirmative defense affected both the parties to the action and the manner in which the case was tried to the jury, including what issues were or were not presented to them for resolution," and therefore, the statute limiting damages against a charitable organization constituted an affirmative defense that  had to "be pled or waived," as required by Rule 8(c)).

answer to assert a statutory damages limit because "allowing the amendment would have prejudiced the [plaintiffs]").

Based on the foregoing, we reverse the circuit court's conclusion that the punitive damages award could not stand under section 15-32-530.

## III.    New Trial Absolute

Target contends the circuit court should have granted it a new trial absolute because the punitive damages award reflected the jury's passion, caprice, and prejudice.  We disagree.[32]

---

[32] Target also contends the circuit court's conclusion that the punitive damages award violated Target's due process rights required the circuit court to order a new trial absolute or new trial nisi remittitur rather than simply setting aside the award. However, this argument is unpreserved.  Target filed a post-trial "Motion for Judgment as a Matter of Law, New Trial Absolute, or New Trial Nisi Remittitur" indicating the primary relief sought was a JNOV as to liability and punitive damages. In this motion, Target expressed a preference for obtaining a JNOV as to liability and punitive damages on the grounds that there was insufficient evidence of constructive notice or proximate causation and there was no evidence showing that Target was willful, wanton, or reckless.  Target sought *as alternative relief* either a new trial absolute or new trial nisi remittitur.  The asserted ground for a new trial absolute was that the awards of compensatory and punitive damages demonstrated "the jury's decision was actuated by passion, prejudice[,] or caprice."  The asserted grounds for a new trial nisi remittitur were (1) the evidence did not support the amount of actual damages awarded, and (2) the evidence did not support the amount of punitive damages awarded; this amount exceeded the cap in section 15-32-530; and the award violated due process.

In addressing this post-trial motion, the circuit court granted Target's preferred relief, a JNOV, as to punitive damages and set aside that award.  In ruling on Target's alternative request for a new trial absolute or nisi, the circuit court addressed primarily the compensatory damages award.  The court noted that the punitive damages award violated due process but concluded that the court had "substantially altered the overall verdict by eliminating the punitive damages award," and did not "find compelling reasons to invade the province of the jury by granting a new trial *nisi*."  Because Target gave the circuit court the impression that it sought a new trial absolute or nisi only in the event the circuit court did not grant a JNOV, Target was required to file a Rule 59(e), SCRCP, motion upon receiving the circuit court's post-

"When a party moves for a new trial based on a challenge that the verdict is either excessive or inadequate, the trial judge must distinguish between awards that are merely unduly liberal or conservative and awards that are actuated by passion, caprice, or prejudice." *Allstate Ins. Co. v. Durham*, 314 S.C. 529, 530, 431 S.E.2d 557, 558 (1993). Likewise, the circuit court must avoid conflating the constitutionality of a damages award with an award motivated by passion or prejudice. *Cf. Mitchell*, 385 S.C. at 592, 596, 686 S.E.2d at 187, 190 (finding a $15 million punitive damages award to be "grossly excessive" such that it rose to the level of a due process violation but finding "no credible evidence anywhere in the record" to support the defendant's contention that the compensatory or punitive damages award resulted from passion, caprice, or prejudice).

> When the verdict indicates that the jury was unduly liberal or conservative in its view of the damages, the trial judge *alone* has the power to reduce the verdict by the granting of a new trial *nisi*.[33] However, when the verdict is so grossly excessive or inadequate that the amount awarded is so shockingly disproportionate to the injuries as to indicate that the jury was moved or actuated by passion, caprice, prejudice, or other considerations *not found in the*

---

trial order to preserve its argument that the only correct relief for the due process violation was either a new trial absolute or a new trial nisi. *See Parker v. Shecut*, 340 S.C. 460, 480, 531 S.E.2d 546, 557 (Ct. App. 2000), *rev'd on other grounds*, 349 S.C. 226, 562 S.E.2d 620 (2002) ("When an order is internally inconsistent, that inconsistency must be raised to the trial court by way of a post-trial motion before it is preserved for appellate review."); *Hubbard v. Rowe*, 192 S.C. 12, 5 S.E.2d 187, 189 (1939) ("[A]ll that this [c]ourt has ever required is that the questions presented for its decision must first have been fairly and properly raised in the lower [c]ourt and passed upon by that [c]ourt.").

[33] The principle underlying a new trial nisi remittitur or additur is that the circuit court "may not impose a substitute for the jury verdict on an unwilling plaintiff" or defendant, and thus, the court may give to the opposing party a new trial unless the plaintiff agrees to remit a part of the verdict or the defendant agrees to add a sum to the verdict. *See Graham v. Whitaker*, 282 S.C. 393, 401, 321 S.E.2d 40, 45 (1984) ("[J]udges have the authority to grant to a defendant a new trial nisi remittitur. In such cases, the judge may not impose a substitute for the jury verdict on an unwilling plaintiff. He may give to the defendant the right to a new trial unless the plaintiff agrees to remit a portion of the verdict.").

*evidence*, it becomes the duty of the trial judge and this [c]ourt to set aside the verdict absolutely.

*Durham*, 314 S.C. at 531, 431 S.E.2d at 558 (second emphasis added) (citation omitted). Further, the amount of unliquidated damages that "a jury might properly award . . . is largely a matter of judgment based upon the facts and circumstances of each case." *Watson v. Wilkinson Trucking Co.*, 244 S.C. 217, 224, 136 S.E.2d 286, 289 (1964). "In determining the question, the facts must be viewed in the light most favorable to the plaintiff[,] and[] whe[n] the amount of a verdict bears a reasonable relationship to the character and extent of the injury sustained, it is not excessive." *Id.* Moreover, "the jury's determination of damages is entitled to substantial deference[,]" and the circuit court's decision on whether to grant a new trial based on the amount of the verdict "will not be disturbed on appeal unless it clearly appears the exercise of discretion was controlled by a manifest error of law." *Welch*, 342 S.C. at 303, 536 S.E.2d at 420.

Here, the jury likely considered the potential harm to Denise, which involved possibly contracting a communicable disease such as HIV or hepatitis, along with the attendant medical costs and possible death. *Cf. Mitchell*, 385 S.C. at 590–92, 686 S.E.2d at 187 (comparing the punitive damages award to the potential harm to the plaintiff). Further, the evidence shows that despite Target employees' awareness of the importance of keeping the parking lot safe for customers, they did not increase the frequency of cleaning the lot after Denise's injury or do anything to improve "safety scans" or cleaning methods after the injury. Therefore, the jury likely considered the possible harm to other customers or their children if Target is not adequately deterred. *Cf. TXO*, 509 U.S. at 460 (considering "the possible harm to other victims that might have resulted if similar future behavior were not deterred"). Because these considerations are rational inferences from the evidence presented at trial, we conclude that the punitive damages award did not result from passion, caprice, or prejudice. Therefore, the circuit court properly denied Target's motion for a new trial absolute.

## IV.    Prejudgment Interest

The Garrisons contend the circuit court should have awarded them prejudgment interest on the full amount of compensatory and punitive damages awarded by the jury rather than merely compensatory damages. We disagree.

Rule 68(a), SCRCP, provides, in pertinent part,

> Any party in a civil action, except a domestic relations
> action, may file, no later than twenty days before the trial
> date, a written offer of judgment signed by the offeror or
> his attorney, directed to the opposing party, offering to
> take judgment in the offeror's favor, or to allow judgment
> to be taken against the offeror *for a sum stated therein, or
> to the effect specified in the offer*.

(emphasis added).  In the present case, Denise made an offer of judgment in the
amount of $12,000 on February 13, 2015.

Further, Rule 68(b) states, in pertinent part,

> If an offer of judgment is not accepted and the offeror
> obtains a verdict *or determination* at least as favorable as
> the rejected offer, the offeror shall recover from the
> offeree: (1) any administrative, filing, or other court costs
> from the date of the offer until the entry of the judgment;
> (2) if the offeror is a plaintiff, eight percent interest
> *computed on the amount of the verdict or award* from the
> date of the offer to the entry of judgment[.]

(emphases added).  Because the circuit court granted a JNOV to Target as to the
punitive damages award, the circuit court computed interest on the $100,000
compensatory damages award only.

The Garrisons maintain that the plain language of Rule 68(a) ties pre-
judgment interest to the amount of the verdict or award and not to "any alteration of
the jury's verdict post-judgment."  However, Target contends that the use of the term
"determination" in the first sentence of Rule 68(b) indicates that the final amount
may be settled by the presiding judge rather than the jury.  We agree.  When this
term is considered in combination with the last phrase of Rule 68(b), "eight percent
interest computed on the amount of the verdict or award from the date of the offer
*to the entry of judgment*,"[34] the plain language of the rule contemplates that interest
is to be computed on the final judgment after all post-trial motions have been
resolved.  *See CFRE, LLC v. Greenville Cty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d
877, 881 (2011) ("[The court] should not concentrate on isolated phrases within the
statute."); *id.* ("Instead, [the court reads] the statute as a whole and in a manner

---

[34] (emphasis added).

consonant and in harmony with its purpose."); *Ex parte Wilson*, 367 S.C. 7, 15, 625 S.E.2d 205, 209 (2005) ("In interpreting the meaning of the South Carolina Rules of Civil Procedure, the [c]ourt applies the same rules of construction used to interpret statutes."); *Johnson*, 396 S.C. at 188, 720 S.E.2d at 520 ("In interpreting a statute, the court will give words their plain and ordinary meaning[] and will not resort to forced construction that would limit or expand the statute."); *Singletary v. S.C. Dep't of Educ.*, 316 S.C. 153, 162, 447 S.E.2d 231, 236 (Ct. App. 1994) ("The intention of the legislature must be gleaned from the entire section and not simply clauses taken out of context.").

Target also argues that pre-judgment interest should not apply to punitive damages awards because the interest is meant to compensate the offering party rather than to punish the party who rejected an offer of judgment. Target acknowledges this is a novel issue in South Carolina and cites opinions from other jurisdictions in support of this argument. In *Haskins v. Shelden*, the Supreme Court of Alaska held that pre-judgment interest should not apply to punitive damages. 558 P.2d 487, 495 (Alaska 1976). The court based its decision on the risk of a double recovery, explaining,

> In making its determination of the appropriate penalty for [the defendant's] actions, the jury probably assessed the penalty it wished [the defendant] to presently pay without discounting for prejudgment interest. In addition, [the plaintiff] was not deprived of the use of money which she expected to have available during the years of litigation.

*Id.*

Also, in *Ramada Inns, Inc. v. Sharp*, 711 P.2d 1, 2 (Nev. 1985), the Supreme Court of Nevada interpreted Nev. Rev. Stat. Ann. § 17.130, which allowed prejudgment interest "[i]n all judgments and decrees, rendered by any court of justice, for any debt, damages or costs."[35] The court held, "Because the amount of punitive damages to be awarded is not known until the judgment is rendered, . . . prejudgment interest may not be granted by a trial court on punitive damage awards," explaining,

---

[35] The statute merely provided, in pertinent part, "the judgment draws interest from the time of service of the summons and complaint until satisfied, except for any amount representing future damages." Nev. Rev. Stat. Ann. § 17.130.

> Prejudgment interest is viewed as compensation for use by defendant of money to which plaintiff is entitled from the time the cause of action accrues until the time of judgment; it is not designed as a penalty. A plaintiff is never entitled to punitive damages as a matter of right; their allowance or denial rests entirely in the discretion of the trier of fact. Therefore, the amount of punitive damages to be awarded cannot be ascertained until the trier of fact has heard all the evidence.

711 P.2d at 2 (citations omitted).

On the other hand, the Garrisons assert that the statutes interpreted in the opinions cited by Target are not offer-of-judgment statutes and, thus, do not have persuasive value. The Garrisons cite a Connecticut opinion interpreting that state's offer-of-judgment statute to allow punitive damages to be included in the computation of pre-judgment interest. In *Kregos v. Stone*, 872 A.2d 901, 906 (Conn. App. Ct. 2005), the Appellate Court of Connecticut highlighted the pertinent language of the statute as it was worded when the opinion was issued: "[i]f the court ascertains from the record that the plaintiff has recovered an amount equal to or greater than the sum certain stated in the plaintiff's 'offer of judgment,' the court shall add to the amount so recovered twelve per cent annual interest on said amount." Conn. Gen. Stat. Ann. § 52-192a.[36] The court held that the word "recovered" in the statute included the entire verdict, both punitive and compensatory damages. 872 A.2d at 906. Notably, Connecticut has a separate pre-judgment interest statute in addition to the offer-of-judgment statute. *See Boulevard Assocs. v. Sovereign Hotels, Inc.*, 861 F. Supp. 1132, 1141 (D. Conn. 1994), *supplemented on other grounds by* 868 F. Supp. 70 (S.D.N.Y. 1994) ("Unlike § 37–3a (prejudgment interest), an award of interest under § 52–192a(b) [the offer-of-judgment statute] is punitive in nature, and is meant to serve the purpose of promoting 'fair and reasonable compromise of litigation without trial.'" (quoting *Crowther v. Gerber Garment Tech., Inc.*, 513 A.2d 144, 151 (Conn. App. Ct. 1986))).

We do not interpret Rule 68 as liberally as the Appellate Court of Connecticut has interpreted that state's offer-of-judgment statute. Rather, we find persuasive the above-quoted reasoning from the opinions in *Haskins* and *Sharp*. Therefore, we

---

[36] The statute was amended after the Appellate Court of Connecticut issued its opinion in *Kregos*.

reject the Garrisons' argument that prejudgment interest calculations should include the amount of a punitive damages award.

## CONCLUSION

We affirm the circuit court's denial of Target's JNOV motion as to liability. We reverse the circuit court's setting aside of the punitive damages award because we find there was sufficient evidence of Target's recklessness. Further, because Target waived the application of the punitive damages caps in section 15-32-530, we reverse the circuit court's conclusion that the punitive damages award cannot stand under section 15-32-530. Nonetheless, we affirm the circuit court's conclusion that the punitive damages award violated due process, and we remand for a remittitur of the award to an amount reasonably consistent with the circumstances of this case. Finally, we affirm the denial of Target's new trial motion and the calculation of pre-judgment interest.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WILLIAMS, J., concurs.**

**HILL, J., concurring in part and dissenting in part:**

I concur in Parts I, III, and IV of the well-crafted majority opinion. I also concur in Part II insofar as it concludes the issue of punitive damages was properly submitted to the jury. I cannot, however, join my good colleagues in the rest of their punitive damages ruling as I believe the punitive damages cap of S.C. Code Ann. § 15-32-530 (Supp. 2019) applies to Garrison's award. I would therefore remand to the circuit court for a hearing on this issue. This would also entail a remand for a hearing on Garrison's argument that the cap is unconstitutional, which the Attorney General must be notified of pursuant to Rule 24(c), SCRCP.

The majority holds the cap put in place by the legislature is an affirmative defense that disappears if not pled. There is an equally reasonable view that the cap is not an affirmative defense, and the circuit court must apply it to all punitive damages verdicts. This view is more consistent with legislative intent and more persuasive for several reasons.

First, nothing in the Act that created the cap requires it be pled at all, much less as an affirmative defense. 2011 Act No. 52. This could be shrugged off as an oversight, but the legislature had pleadings in mind, as the very first sentence of the Act as

codified directs that "[a] claim for punitive damages must be specially prayed for in the complaint." § 15-32-510(A).

Second, whether a matter is an affirmative defense is controlled by Rule 8(c), SCRCP, which lists twenty-two specific defenses. Damages caps are not listed, but the list is not exclusive, so the question becomes whether the cap is "any other matter constituting an avoidance or affirmative defense." Rule 8(c), SCRCP. This question is one of interpretation and, as in interpreting statutes, our role is to discern legislative intent.

A cap is not a defense to a cause of action. All of the specific affirmative defenses listed in Rule 8(c), SCRCP, share a defining characteristic: they bar liability for the cause of action. If the affirmative defense is proven, the defendant is not liable at all, even though the facts the plaintiff has alleged might otherwise entitle the plaintiff to judgment on the cause of action. *See O'Neal v. Carolina Farm Supply of Johnston, Inc.*, 279 S.C. 490, 494, 309 S.E.2d 776, 779 (Ct. App. 1983). The listed affirmative defenses have another common characteristic: not one of them relates to a bar or limitation on damages for the cause of action, or any other post-verdict matter.

Nor is the cap an "avoidance." At first glance, an avoidance and an affirmative defense appear to be identical twins. But a closer look reveals the distinguishing characteristic of an avoidance is that it depends upon the introduction of new facts to defeat a cause of action, whereas an affirmative defense relies on the plaintiff's own facts. This court has observed:

> At common law, a pleading of confession and avoidance is the introduction of new or special matter which admits the factual premises of the opposing party's pleading but avoids or repels his conclusions. New matter involves of necessity a new issue, or the introduction of a new ingredient as the basis of one which operates as a defense. A plea by way of confession and avoidance admits that the cause of action alleged did once exist, but avers subsequent facts which operate to destroy the cause of action and defeat a recovery. Thus, an avoidance is a defense which goes beyond the basic elements of the opposing party's cause and depends upon additional facts to defeat the claim.

*Oyler v. Oyler*, 293 S.C. 4, 6–7, 358 S.E.2d 170, 172 (Ct. App. 1987) (internal citations omitted). In my view, the plain reading of Rule 8(c), SCRCP, results in the conclusion that the punitive damages cap is neither an avoidance nor an affirmative defense, for it does not affect the defendant's liability on the cause of action (only the damages), and it depends upon the straightforward application of a statute, not new facts (other than the return of the triggering punitive damages verdict).

The majority is quite correct that *James v. Lister* held a damages cap on recovery against charitable organizations was an affirmative defense that was waived if not pled. 331 S.C. 277, 282-83, 500 S.E.2d 198, 201 (Ct. App. 1998). One difference between *James* and our facts is, as the majority points out, the statutory caps there specifically required the joinder of another party (the employee of the charity) and a special verdict of the jury that the employee's gross negligence proximately caused the injury. These procedural requirements fundamentally affected both the parties and the proof at trial. By contrast, the punitive damages cap here is not an issue for the jury and does not require adding a new party.

This contrast aligns our facts more with *Parker v. Spartanburg Sanitary Sewer Dist.*, which was decided after *Lister* and held the statutory damages cap codified in the Tort Claims Act was "self-executing" and not an affirmative defense that had to be pled. 362 S.C. 276, 285, 607 S.E.2d 711, 716 (Ct. App. 2005); *see also Broome v. Watts*, 319 S.C. 337, 342, 461 S.E.2d 46, 49 (1995) (statutory right to setoff not an affirmative defense falling within residuary clause of Rule 8(c), SCRCP, because setoff was required by statute and not issue for jury).

The majority's thorough opinion acknowledges that the question of whether statutory damages caps are affirmative defenses has split the federal circuits. No circuit has provided any useful analytical model. In addition to *Zorilla*, the Texas supreme court decision the majority cites, several other states have decided caps are not affirmative defenses. *McGinnes v. Wesley Med. Ctr.*, 224 P.3d 581, 591 (Kan. Ct. App. 2010); *Anderson v. City of Milwaukee*, 559 N.W.2d 563, 569 (Wis. 1997); *Snyder v. City of Minneapolis*, 441 N.W.2d 781, 788 (Minn. 1989).

Frustrated in their search for a coherent approach to deciding what counts as an affirmative defense under the residuary clause of Rule 8(c), the leading commentators on the federal rules have thrown up their hands and acknowledged they can find no objective waypoint, noting "resort must often be had to considerations of policy, fairness, and, in some cases, probability." C. Wright & A. Miller, *Federal Practice and Procedure: Federal Rules of Civil Procedure* § 1271 (3rd Ed.). Their attempt to reconcile these three broad subjective criteria with the

rule and what happens in courtrooms fares no better, for there are only two practical, interlocking questions: whether the matter claimed to be an affirmative defense unfairly surprised the other party, and whether the party asserting the matter has unique access or control to the facts comprising the defense. Looking at Target's assertion of the cap, the answer to both questions is no.

Which leads to my next point: even if the cap is an affirmative defense that must be pled, I would not find waiver here because Garrison has not demonstrated unfair surprise or other prejudice. *Plyler v. Burns*, 373 S.C. 637, 650, 647 S.E.2d 188, 195 (2007) (holding because the goal of Rule 8(c), SCRCP, is to avoid surprise, technical failure to plead immunity as an affirmative defense did not waive it where defendant timely raised it to trial court and plaintiff was not prejudiced or unfairly surprised). The cap is a matter for the court, not the jury. It would be remarkable for Garrison to claim she was blindsided by the cap because she was unaware of basic statutes governing punitive damages, and she does not make such a claim. Her prejudice argument is had she known Target would rely on the cap, she would have focused her evidence more on the financial motivations for Target's conduct. This alludes to an exception to the cap relevant here, which raises the cap to either four times the compensatory damages award or two million dollars if the circuit court determines (1) Target's wrongful conduct was motivated primarily by unreasonable financial gain, and (2) Target's managing agent, director, officer, or the person responsible for making Target's policy decisions knew or approved of the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct. *See* S.C. Code Ann. § 15-32-530(B)(1) (Supp. 2019).

If Garrison had additional evidence meeting this criteria, it is doubtful the only thing holding her back from presenting it to the jury was Target's failure to allege the cap as an affirmative defense. Lawyers who have smoking guns use them.

Calling a matter an affirmative defense has an important consequence: it shifts the burden of proof to the defendant. *O'Neal*, 279 S.C. at 494, 309 S.E.2d at 779 (describing that upon assertion of affirmative defense, "the burden of proof shifts to the defendant to show he is not liable"). Yet, the legislature did not assign the burden of proving the cap to any party. It simply directed the trial judge to determine which level of the cap applies. The practical effect of the majority opinion will be to place the burden on a defendant to prove the cap (and which level) applies. The awkwardness of trying to fit the concept of burden-shifting—a concept designed for determining liability—onto a damages cap is a good clue the cap does not resemble an affirmative defense. One is reminded of Abraham Lincoln's story about how many legs a sheep would have if you counted the tail a leg. When told the answer

was five, the response was that calling the tail a leg did not make it one. *See* Rice, ed., *Reminiscences of Abraham Lincoln by Distinguished Men of his Time* at 241-42 (Harper & Bros., 1909).

There is yet another reason to conclude the legislature intended the cap procedure to be self-executing, one that promotes symmetry and predictability in the law's design. Public policy debate has swirled around punitive damages for decades, with some claiming the awards are arbitrary. As the legislature well knew when it passed the cap, ever since *Gamble v. Stevenson* circuit courts in our state have had the mandatory duty to conduct post-trial review of a punitive damages award to ensure it comports with due process. 305 S.C. 104, 111–12, 406 S.E.2d 350, 354 (1991). This duty does not depend on a party's pleading or request. *Id.* To hold the statutory cap on punitive damages lives or dies by the whims of pleading creates an unwarranted dichotomy in the judicial treatment of punitive damages awards. Some may now claim the caps are as arbitrary as the awards they are designed to control.

With great respect for the majority, I respectfully dissent.